# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| ANGELA WOOD, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOSEPH WOOD, DECEASED,<br><br>     Plaintiff,<br><br>v.<br><br>JEFFERSON DUNN, GRANTT CULLIVER, EDWARD ELLINGTON, KAREN CARTER, DEWAYNE ESTES, ANTHONY BROOKS, CEDRIC SPECKS, KEVIN WHITE, and GARY MALONE,<br><br>     Defendants. | Civ. A. No.: 2:19-CV-511-MHT-WC<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff Angela Wood, as personal representative of the Estate of

Decedent Joseph Wood, files this Third Amended Complaint and states as

follows:

**INTRODUCTION**

1.      Plaintiff Angela Wood, the mother of Decedent Joseph Wood,
brings this action to recover for Defendants' deliberate indifference to the
substantial risk of serious harm to Mr. Wood, which resulted in the brutal
murder of Mr. Wood by one or more inmates at the St. Clair Correctional
Facility (the "St. Clair Prison") in Springville, Alabama.[1]

2.      The St. Clair Prison, a Level 5 "close security" prison, has long
been known as one of the most dangerous and violent prisons in Alabama.
Because of insufficient supervision by prison personnel, inmates at the St.
Clair Prison experience extreme and sometimes lethal violence at the hands
of other inmates.

3.      The Alabama Department of Corrections ("ADOC") transferred
Mr. Wood to the St. Clair Prison from the Ventress Correctional Facility (the
"Ventress Prison"), a medium security Alabama prison, so that he could
attend the only residential substance abuse treatment program within the

---

[1] In *State v. Furniss*, Case No. CC-2019-000241 PKS (Ala. Cir. Ct., St. Clair
Ctu.), the State is prosecuting Arlo Lee Furniss for Mr. Wood's murder.

ADOC. Mr. Wood lived in the separate therapeutic community dormitory at the St. Clair Prison for a period of time, but shortly after his arrival at the St. Clair Prison, prison officials placed Mr. Wood in N-Block, which is designated general population.

4.      In July 2017, correctional officers found his lifeless body in his cell in N-Block, face down in a pool of blood between the beds with his hands tied to separate bedposts. Mr. Wood, 33, had been beaten and strangled to death after assailants entered his cell.

5.      At some point after Mr. Wood arrived at the St. Clair Prison, he became the target of extortion schemes perpetrated by other inmates. He was especially vulnerable to these schemes because it quickly became known that members of his family were able and willing to put money on Mr. Wood's books and on other accounts.  Corrupt correctional officers and a lack of oversight by supervisory personnel facilitated these extortion schemes.

6.      On several occasions, other inmates forced Mr. Wood to call Plaintiff and other family members using contraband cell phones to extort

money from Mr. Wood's family members. During the calls, Plaintiff could hear other inmates in the background (a) coaching Mr. Wood on how much money to request and (b) threatening Mr. Wood's life if Plaintiff failed to pay. To protect her son, Plaintiff put money on payment cards and read the pin numbers for the cards to Mr. Wood so that he could provide the inmates who were threatening him with access to the funds.

7.      Ultimately, these inmates made good on the threats, as assailants strangled and beat Mr. Wood to death at the St. Clair Prison on July 22, 2017, without any interference from the correctional officers that should have been monitoring Mr. Wood's cell block.

8.      Mr. Wood and his cellmate were in a physical altercation less than seven months before Mr. Wood's death. Defendants knew that Mr. Wood was not physically safe living with his cellmate but allowed them to continue housing together.

9.      Mr. Wood's cell should have been a safe haven for Mr. Wood, but due to Defendants' deliberate indifference to the safety of Mr. Wood, a known aggressor lived in the cell with him. Defendants intentionally and

knowingly housed Mr. Wood with a known aggressor that, according to Defendants, ultimately murdered him.

10.     Unfortunately, other inmates and their families have experienced similar extortion schemes, violence, sexual assault, and even death when the inmates were incarcerated at the St. Clair Prison. At the St. Clair Prison, many of the inmates possess contraband weapons; and murders, rapes, stabbings, and beatings have become routine.

11.     Defendants knew of the dangerous conditions that led to Mr. Wood's murder. In October 2014, the Equal Justice Initiative ("EJI") filed a class action complaint detailing the endemic violence overtaking the St. Clair Prison and the poor leadership, mismanagement, and inadequate policies and procedures responsible for its rise. *See Duke, et al. v. Thomas, et al.*, Compl., No. 4:14-cv-1952 (N.D. Ala. filed Oct. 13, 2014) (Dkt. No. 1) (the "*Duke* Litigation"). In November 2017, a few months after Mr. Wood's murder, the ADOC reached a settlement with the *Duke* Litigation plaintiffs and promised to institute necessary reforms.

12.     Defendants have been named in numerous inmate lawsuits relating to the dangerous conditions at the St. Clair Prison before the brutal killing of Mr. Wood. These lawsuits consistently allege that inmates face a serious and immediate security risk at the St. Clair Prison because of the proliferation of contraband weapons, the number of broken locks on cell doors, and a lack of supervision and monitoring of inmates.

13.     Because of Defendants' deliberate indifference to the egregious conditions at the St. Clair Prison, other inmates brutally murdered Mr. Wood when he should have been monitored by and under the supervision of Defendants.

## PARTIES

14.     Plaintiff Angela Wood is the mother of Joseph Wood, and the duly appointed Personal Representative of the estate of Decedent Joseph Wood, deceased. Plaintiff is an individual resident of Houston County, Alabama.

15.     Defendant Jefferson Dunn is the Commissioner of the ADOC and, upon information and belief, a resident of Montgomery County,

Alabama. The Commissioner is the highest ranking official in the ADOC and is responsible for the direction, supervision, and control of the ADOC.

16.    Defendant Grantt Culliver is a resident of the State of Alabama. At all times material hereto, Defendant Culliver was employed by ADOC as the Associate Commissioner for Operations. As Associate Commissioner, Defendant Culliver was responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, Institutional Coordinators, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division.

17.    Defendant Edward Ellington is a resident of the State of Alabama. At all times material hereto, Defendant Ellington was employed by ADOC as the Instructional Coordinator. Upon information and belief, as the Institutional Coordinator responsible for the St. Clair Prison, Defendant Ellington was responsible for overseeing the Warden's management of the Prison's operations, safety, and security.

18.     Collectively, Defendants Dunn, Culliver, and Ellington are referred to as the "Defendant Administrative Supervisors."

19.     Defendant Dewayne Estes is a resident of the State of Alabama. At all times material hereto, Defendant Estes was employed by ADOC as the Warden of the St. Clair Prison, located in Springville, St. Clair County, Alabama. Defendant Dunn appointed Defendant Estes as Warden and he undertook the role in March 2015. As Warden of the St. Clair Prison, Defendant Estes was responsible for the day-to-day operations of the prison, the safety and security of all inmates at the prison, and the supervision of all subordinate employees. Defendant Estes' responsibilities as Warden included ensuring adequate supervision and monitoring of inmates, adequate classification of inmates, appropriate housing assignments for inmates, adequate staffing levels, appropriate discipline and deterrence of inmate and staff misconduct, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

- 8 -

20.     Defendant Karen Carter is a resident of the State of Alabama. At all times material hereto, Defendant Carter was employed by ADOC as Assistant Warden of the St. Clair Prison. Defendant Carter had previously worked at the St. Clair Prison, as an officer from 1990 to 1998 and as a lieutenant from 2005 to 2010. Defendant Carter's monitoring and oversight responsibilities at the St. Clair Prison encompassed administrative duties at the prison, including the Therapeutic Community substance abuse program; the classification and housing assignment process at the St. Clair Prison; and investigations into inmate-on-inmate assaults. Defendant Carter also reviewed and approved all disciplinary and incident reports at the prison.

21.     Defendant Anthony Brooks is a resident of the State of Alabama. At all times material hereto, Defendant Brooks was employed by ADOC as Assistant Warden of the St. Clair Prison. Upon information and belief, Defendant Brooks' oversight responsibilities at the St. Clair Prison included contraband searches; investigations into inmate and employee misconduct, reviews of such investigations, or both; inmate movement,

including to and from recreation; and safety and security during certain shifts.

22.     Defendant Cedric Specks is a resident of the State of Alabama. At all times material hereto, Defendant Specks was employed by ADOC as Assistant Warden of the St. Clair Prison. Upon information and belief, Defendant Specks' oversight responsibilities at the St. Clair Prison included contraband searches; investigations into inmate and employee misconduct, reviews of such investigations, or both; inmate movement, including to and from recreation; and safety and security during certain shifts.

23.     Defendant Kevin White is a resident of the State of Alabama. At all times material hereto, Defendant White was employed by ADOC as a Captain. As Captain, Defendant White was responsible for the safety of all inmates at the prison and the supervision of all security activities and subordinate employees.

24.     Defendant Gary Malone is a resident of the State of Alabama. At all times material hereto, Defendant Malone was employed by ADOC

as a Captain. As Captain, Defendant Malone was responsible for the safety of all inmates at the prison and the supervision of all security activities and subordinate employees. Defendant Malone became a Captain of General Population in July 2015. As a Captain of General Population, his duties included authorizing all housing assignments at the St. Clair Prison.

25.     Defendants Unknown Shift Commanders were the shift commanders on duty in N-Block at the St. Clair Prison from the date of Mr. Wood's arrival through the date of the murder of Mr. Wood on July 22, 2017. The responsibilities of the shift commanders included staffing the housing units where Mr. Wood was attacked; overseeing subordinates who supervised Mr. Wood's housing unit; ensuring that security checks were completed in Mr. Wood's housing unit; and investigating and evaluating requests for housing assignment changes.

26.     Plaintiff refers collectively to Defendants Estes, Carter, Brooks, Specks, White, and Malone as "Defendant Prison Supervisors."

27.     Plaintiff refers collectively to Defendants Dunn, Culliver, Ellington, Carter, Estes, Brooks, Specks, White, and Malone as "Defendants."

28.     Plaintiff sues each of the Defendants in his or her individual capacity unless otherwise noted. Each of the Defendants acted under color of state law when engaging in the misconduct described herein.

## JURISDICTION AND VENUE

29.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(1)(2)-(3) because this action is brought under 42 U.S.C. § 1983, seeking damages for Defendants' violations of the constitutional rights of Decedent Joseph Wood. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     Venue appropriately lies in this judicial district under 28 U.S.C. § 1391(b)(1) because some of the Defendants are residents of, or otherwise situated in, Montgomery County, Alabama, which is located in the Northern Division of the Middle District of Alabama.

## FACTUAL ALLEGATIONS

**A.   Mr. Wood is transferred to St. Clair Prison, the "worst of the worst."**

31.    Since arriving at ADOC in 2011 with a life sentence as a repeat offender, Mr. Wood had been, by all accounts, a model prisoner.  He had received no disciplinary infractions, and had graduated from several different trade programs.  Two of the certificates Mr. Wood had received for completing programs were proudly displayed on the walls of his cell at the time of Mr. Wood's death.

32.    Before Mr. Wood's transfer to St. Clair Prison – a facility which Defendant Commissioner Dunn described as the "worst of the worst" – Mr. Wood had been incarcerated at the Ventress Prison, a medium security prison.

33.    Upon information and belief, Mr. Wood transferred to the St. Clair Prison – a close security (or maximum security) prison – to participate in the Therapeutic Communities program, the only residential substance abuse treatment program in the Alabama state prison system at

the time. Participation in the program could have increased his chances for parole when he became eligible for parole in 2021.

34.    Participants in the Therapeutic Communities program reside in a housing area separated from the rest of St. Clair Prison's general population, which consists of inmates the ADOC has identified as requiring maximum security incarceration.

35.    For reasons presently unknown, Mr. Wood left the Therapeutic Communities program after two months. Rather than returning Mr. Wood to a medium security prison (as he had been in before his transfer to the St. Clair Prison), ADOC placed him in the general population at the St. Clair Prison.  At one point shortly after he leaving the TC program, Mr. Wood urgently requested that he be transferred back to Ventress or any other ADOC facility close to Dothan so that he could be near his family, who was unable to visit him at St. Clair because of the considerable distance.

**B.**   **As a result of Defendants' deliberate indifference, Mr. Wood is housed with a violent, sexual predator who is ultimately charged with his murder.**

36.   Mr. Furniss is a violent prisoner and a known sexual predator with numerous disciplinaries on his record.  On more than one occasion, Mr. Furniss had viciously attacked other inmates with whom he was having sex and/or who were indebted to him.

37.   In June 1996, Mr. Furniss was disciplined for fighting with another inmate.  The prison officials determined that the reason for the fight was homosexual in nature due to refused sexual favors.  Both inmates signed an "I/We Peace Agreement" and were released to general population.

38.   Less than two months later, Mr. Furniss got into another altercation with an inmate whom he allegedly threatened with a broom.  Both inmates signed a Living Agreement and were released back to population.

39.   Approximately five months later, in January 1997, Mr. Furniss got into a fight with another inmate whom Mr. Furniss claimed was

indebted to him.  Both inmates signed an I/We Peace Agreement and were released to population.

40.    In January 1998, Mr. Furniss harassed another inmate and then struck him in the face while he was talking to a corrections officer.  Mr. Furniss was disciplined and both inmates signed an I/We Living Agreement before being released to general population.

41.    In 1998, while incarcerated at a different ADOC facility, Mr. Furniss was disciplined for fighting with his cellmate with whom he claimed to be in a homosexual relationship.  Both inmates were disciplined and signed living agreements, but were thereafter placed in separate cells.

42.    In 1999, Mr. Furniss got into a fight with another inmate after Mr. Furniss claimed that the inmate's cellmate was indebted to Mr. Furniss for sexual favors.  All three inmates signed a "living agreement" and remained in the same cell block.

43.    In 2000, Mr. Furniss was disciplined for cutting a fellow inmate with a razor blade.  According to prison officials, the incident stemmed from homosexual activity between Mr. Furniss and the other

inmate.  After the incident, Mr. Furniss signed a living agreement agreeing that he could live in the general population with the other inmate.

44.    A couple years later, in 2002, Mr. Furniss was again disciplined for cutting his cellmate with a razor blade over homosexual relations.  Five months later, Mr. Furniss brutally attacked the same cellmate in his sleep with a box cutter, sending him to the hospital with numerous lacerations to his head and torso.  Not surprisingly, prison officials again determined that Mr. Furniss's assault was a result of homosexual activity between Mr. Furniss and his cellmate.

45.    Prior to 2008, Mr. Furniss had been incarcerated at William E. Donaldson Correctional Facility, which, according to the ADOC website, is a maximum security facility that "specializes in controlling repeat and/or multiple violent offenders with lengthy sentences that are behaviorally difficult to manage."   Mr. Furniss was subsequently transferred to a medium security facility, but prison records cautioned that he should be sent back to Donaldson at the first sign of aggression.

46.    In August 2016, after having been transferred to St. Clair Prison, Mr. Furniss was identified as a potential sexual predator.  Shortly thereafter, on December 22, 2016, he was assigned to Mr. Wood's cell.

47.    Within a month, in January 2017, Mr. Wood and Mr. Furniss were in a physical altercation that required medical attention.  When that altercation was identified as a "lovers quarrel," it should have been reported as a PREA incident and Mr. Wood and Mr. Furniss should have been separated pending an investigation and thereafter permanently separated, particularly given the known dangerous conditions at St. Clair, including but not limited to overcrowding, understaffing, outdated facilities, uncontrolled inmate movement, contraband, extortion, violence and rape.  Instead, with deliberate indifference to the safety of Mr. Wood, no investigation was conducted and Mr. Wood and Mr. Furniss were presented a Living Agreement to sign and remain in the same cell since it was only a "lovers quarrel."  The Living Agreement was, in reality, simply intended to be a release of liability for Defendants and other ADOC employees for housing Mr. Wood and Mr. Furniss together again.

Although Mr. Wood and Mr. Furniss should each have been disciplined for the incident under ADOC policies, they were not disciplined after signing the Living Agreement.  Upon information and belief, it was a common practice among Defendants at St. Clair for inmates to be pressured into signing such living agreements to avoid being placed into segregation or facing other discipline.

48.    It was also well-known to Defendants that sexual favors in prison are currency with which debts are paid, whether for protection, or to pay off drug or gambling related debts.  Because Defendants and other ADOC employees have failed to protect the inmates, often times sexual favors are the only means that an inmate has to protect himself.  Despite knowing that such sexual favors are not "consensual sex," and the participants are not "lovers," routinely and deliberately disregarded the dangerous circumstances created by allowing such activity to go on unabated.

49.    After the January altercation, Mr. Wood and Mr. Furniss were often seen fighting according to other inmates, to the point where other

inmates told Mr. Wood that he needed to get away from Mr. Furniss. At the same time, Mr. Wood's family members, including Plaintiff, were receiving phone calls from Mr. Wood that demanded money.

50. The calls came from various cell phones, the numbers of which Mr. Wood's family members did not recognize. Upon information and belief, Mr. Furniss and/or other inmates extorting money from Mr. Wood and his family members, or to whom Mr. Wood owed alleged debts, supplied Mr. Wood with the cell phones.

51. During these calls, Mr. Wood anxiously explained to Plaintiff and to other family members his concerns with serious harm or even death at the hands of other inmates. Mr. Wood informed his family members that these inmates threatened to assault him if he did not pay the inmates certain sums of money.

52. Mr. Wood would frantically plead with Plaintiff to send him money, describing the request as a matter of life or death. Plaintiff could hear inmates in the background telling Mr. Wood what to say and how much money to request in exchange for his physical safety.

53.     Mr. Wood called his family members on an almost daily basis, pleading for money to pay off other inmates in order to remain safe in general population at the St. Clair Prison.

54.     An inmate struck Mr. Wood in the head immediately before one such call where Mr. Wood left a rambling, incoherent voicemail message for Plaintiff. The incoherency appeared to have been caused or exacerbated by the head injury. Mr. Wood's message attempted to express his fear of further assaults and to request money to pay off his assailant or assailants.

55.     On the day Mr. Wood was murdered, there was no correction officer assigned as a Rover in N-Block, in violation of ADOC and St. Clair policies and procedures.  Defendants recognized that not assigning Rovers was dangerous, as their own SOPs expressly stated that such Rovers were the primary line of security in the prison, responsible for the overall security and cleanliness inside the cellblocks.

56.     Despite policies and procedures requiring that Rovers be assigned at all times in the N-Block, especially during the day, Defendants frequently failed to assign such Rovers.  Rovers were also supposed to

conduct at least four shakedowns each shift to control contraband in the prison.  Defendants also failed to require Shift Commanders to document each and every instance where Rovers were not assigned and/or shakedowns were not conducted.

57.    Defendants were also deliberately indifferent to uncontrolled inmate movement within St. Clair Prison, and N-Block in particular.

58.    Mr. Wood was vulnerable to attack because Defendants allowed Mr. Wood to live with a known aggressor; Defendant Prison Supervisors' failed to (a) install an intercom system, cameras, or mirrors to alert "cube" officers about activities in the interior of Mr. Wood's cell, (b) adequately staff the Prison, and (c) institute and enforce patrolling policies to combat the pervasive risk of violence inside the St. Clair Prison.

59.    After learning of Mr. Wood's death, Ms. Wood experienced a stroke requiring immediate hospital treatment, despite being only in her mid-fifties at the time.

60.     The Warden of the St. Clair Prison (Defendant Estes) did not

contact Plaintiff until approximately one week after Mr. Wood's death,

and only did so after numerous attempts by Plaintiff to reach him.

61.     Despite multiple inquiries, the only information the ADOC

provided Plaintiff concerning Mr. Wood's death is that the death was

"being considered a murder."

62.     After the ADOC released Mr. Wood's body to Plaintiff for

burial, Plaintiff personally observed physical evidence of Mr. Wood

having been beaten, strangled, and stabbed. Among other things, Mr.

Wood had deep lacerations in his chest and strangulation marks around

his neck.

63.     The medical examiner's examination of Mr. Wood's body

indicated Mr. Wood had large contusions around his right eye, a large

skull fracture or depression in the middle of his forehead, ligature marks

around his neck, and a stab wound in his upper right shoulder.

64.     Throughout his life, Mr. Wood had been a devoted son, a

beloved brother to five siblings, and a caring father to a son and daughter.

65.     Despite being in the custody of the ADOC, Mr. Wood had a

bright outlook on the future and his parole eligibility date (February 2021)

was approaching.

66.     Mr. Wood desired to be an effective caregiver and provider for

his children. While housed at the Ventress Prison, Mr. Wood took courses

in various trades such as brick masonry and graduated from Wallace

College with honors. Mr. Wood also learned how to work on small

engines so that he would be employable upon release.

67.     Mr. Wood could have been eligible for parole in 2021 had he

not become yet another victim of a gruesome murder as a result of

Defendants' failure to address the known epidemic of violence at the St.

Clair Prison.

## C.     Inmates at the St. Clair Prison have experienced an epidemic of violence at the hands of other inmates for years.

68.     Defendants were all aware of the extremely high rate of

violence at the St. Clair Prison well before Mr. Wood's murder in 2017.

69.     Since 2010, reported assaults at the St. Clair Prison have

increased exponentially. In 2010, inmates reported 23 assaults; in 2011, 59

assaults; in 2012, 78 assaults; in 2013, 101 assaults; in 2014, 127 assaults; in 2015, 157 assaults; and in 2016, 249 assaults (meaning more than a ten-fold increase in the number of reported assaults over a period of six years). By July 2017 – the month of Mr. Wood's murder – inmates had reported a total of 110 assaults for the first seven months of that calendar year.

70.     In 2014, the homicide rate for the St. Clair Prison was approximately 232.4 per 100,000 inmates. This represents a homicide rate 45 times higher than the national homicide rate for state prisons of approximately five homicides per 100,000 inmates.

71.     Nationally-recognized corrections expert Steve J. Martin examined the conditions at the St. Clair Prison and opined in a 2016 report: "The frequency of assaults resulting in life-threatening injuries is quite simply among the highest I have observed in my 43-year career in corrections."

72.     The below non-exhaustive list summarizes publicly-available information regarding assaults and murders at the St. Clair Prison in just the two years preceding Mr. Wood's death in 2017:

a.    In January 2015, an inmate assailant attacked Bradley Gant with a metal lock, causing him to suffer head and facial injuries that required staples in the back of his head and stitches on his chin. The assailant previously had harassed Mr. Gant. When Mr. Gant reported the earlier harassment, a Captain at the St. Clair Prison responded that the other inmate "isn't here to take care of you," and advised Mr. Gant to "get a knife and do something about it."

b.    In January 2015, an inmate assailant stabbed Derrick LaKeith Brown, an inmate who suffers from hemophilia. His wounds included a punctured liver and internal bleeding that required treatment at UAB hospital.

c.    In January 2015, an inmate assailant robbed and stabbed Elliott Blount while he was in his cell, which was in a blind spot in N-Block. Although Mr. Blount's assailant was assigned to P/Q-Block, prison personnel allowed him to enter an unassigned living area. Mr. Blount suffered severe head injuries that required extensive surgery at UAB hospital.

d.      In January 2015, an inmate assailant stabbed and punched Justen Stinson in his cell in P-Block. No correctional officers were available to assist Mr. Stinson after the assault. Instead, Mr. Stinson was forced to wander through several other blocks to seek help for his injuries from other inmates.

e.      In January 2015, an inmate assailant stabbed and cut Micah Mays multiple times during a robbery attempt in N-Block. Mr. Mays suffered injuries to his face, wrists, neck, and shoulders. Prison personnel allowed the assailant to enter N-Block from a different block. Mr. Mays's injuries were so severe he required treatment at UAB hospital.

f.      On or about February 1, 2015, J.D. raped J.M. at knifepoint in a blind spot in the H-Block. The attack occurred after J.M. repeatedly requested a new bed assignment. After the rape, prison personnel placed J.M. in segregation close to his assailant, who threatened J.M. for months to retract his rape complaint. J.M. was subjected to discipline for refusing to return to general population. He was never

informed of the results of the Investigations & Intelligence ("I&I") investigation into his rape.

g.    In February 2015, an inmate assailant stabbed Brandon Ladd during an attempted robbery in his cell in L-Block. The assailant was assigned to a different block, but prison personnel allowed him to freely enter an unassigned block. Mr. Ladd suffered stab wounds to his forearm and chest, resulting in a collapsed lung, which required extensive treatment, including surgery, at UAB hospital.

h.    In February 2015, an inmate assailant assaulted Larry Hill in his cell block. The cube officer permitted the assailant's entry into the cell block. Mr. Hill was beaten with knife handles and fists, and knocked unconscious.

i.    Around February 2015, an inmate assailant stabbed Dillon Cole multiple times in L-Block.

j.    In March 2015, multiple inmate assailants assaulted Jeffrey Peoples while he was sleeping in his cell.

k.      In March 2015, an inmate assailant stabbed and seriously injured David Beech, who is 58 years old. The assault occurred while both inmates were waiting in the noon pill call line. The assailant stabbed Mr. Beech multiple times with a box cutter. Mr. Beech was treated at UAB hospital and received numerous staples on his wrist, head, and back.

l.      In March 2015, Nakia Echols suffered multiple stab wounds from another inmate. While Mr. Echols was sleeping in the early morning hours, an assailant entered his cell in P-Block armed with a knife and ice pick. Following the assault, Mr. Echols was too frightened to return to his cell and slept for a week on a bench in Q-Block, undetected by prison staff.

m.      In March 2015, three inmates stabbed Jamal Woods in L-Block. The assailants stabbed Mr. Woods in his head, face, shoulder, and leg, causing serious injuries that required two trips to UAB hospital. The assault was in plain sight of the cube officer, the lone officer in the block overseeing 96 inmates.

n.     In March 2015, inmate assailants stabbed James Dorriety multiple times in his head and back, causing Mr. Dorriety to suffer a punctured lung. Three inmates, armed with knives, robbed and assaulted Mr. Dorriety while he was returning to the cell block in the honor dorm after purchasing items from the prison canteen. Mr. Dorriety's injuries required treatment at UAB hospital, where he received numerous staples in his head and surgery to treat a lung injury.

o.     In April 2015, W.C.'s cellmate raped him twice at knifepoint in the middle of the night. W.C. then faced retaliation from friends of his assailant. W.C. did not receive continuing mental health care and never heard the outcome of the I&I investigation into his rape.

p.     On April 2, 2015, an inmate assailant brutally raped Michael Townsel at knifepoint in the middle of the day when he was forced into a cell. No officer intervened during Mr. Townsel's abduction and rape, nor did Mr. Townsel observe any officers present during the rape. While in the cell, Mr. Townsel had no way to contact any security staff to obtain help.

q.     On April 15, 2015, an inmate assailant attacked Michael McGregor while he was asleep in his cell and after he closed and locked the cell door. The assailant entered the cell by tricking the damaged lock. The assailant attacked Mr. McGregor with two shanks, stabbing Mr. McGregor's head, back, neck, and chest. After some time, correctional officers discovered Mr. McGregor in his cell covered in blood due to his life-threatening injuries.

r.     In May 2015, inmate assailants robbed and assaulted Victor Russo shortly after returning to his cell from the prison store. Mr. Russo's cell door had a broken lock, and the assailants were able to open his cell door and enter his cell. They attacked Mr. Russo, who is 52, and stole all of his recently-purchased store items. Mr. Russo suffered facial injuries requiring treatment at UAB Hospital.

s.     In May or June 2015, an inmate assailant stabbed Janarious Smith during yard time in the segregation unit. While walking in the yard area, the assailant was able to remove his handcuffs and stab

Mr. Smith – who was handcuffed behind his back – several times with a knife.

t.      In July 2015, multiple inmate assailants attacked Omar and Jamal Denson, stabbing them both multiple times. Jamal Denson suffered serious wounds to his head, kidneys, and lungs, requiring treatment and surgery at UAB hospital.

u.      In July 2015, another inmate assailant assaulted Micah Mays in his cell in Q-Block. He suffered several stab wounds and a broken arm.

v.      In September 2015, Douglas Simon's cellmate stabbed him in the face, arm, and neck. Mr. Simon ran out of his cell, but his cellmate chased him through the block with his knife. Other inmates tried to get the attention of the cube officer, but he was asleep. Mr. Simon's injuries were so severe they required treatment at an outside hospital.

w.      In September 2015, Nakia Echols was the victim of a second stabbing incident. Two inmate assailants stabbed Mr. Echols

multiple times. The injuries were so serious he had to be in an outside hospital for about five days.

x.       In November 2015, an inmate assailant fatally stabbed Timothy Bradford Latham multiple times in the chest.

y.       In May 2016, correctional officers found Emory Cook unresponsive in his cell during the morning after lockdown. His death was ruled a homicide.

z.       In May 2016, Jaime Chavez reported being subjected to extortion and subsequently stabbed. Mr. Chavez twice informed officers that he was under threat, but officers did not respond. Mr. Chavez was assaulted two additional times before his nose was broken and he was moved to segregation.

aa.     On June 22, 2016, two inmates entered Brian Holley's segregation cell and brutally beat him, resulting in a broken jaw.

73.     Because of the epidemic of violence at the St. Clair Prison and other Alabama state correctional facilities, the U.S. Department of Justice ("DOJ") opened a Civil Rights of Institutionalized Persons Act

Investigation in October 2016 (the "DOJ Investigation"). The DOJ issued a report of its findings on April 2, 2019.

74.     The following are incidents of assaults and murders at the St. Clair Prison in 2016 and 2017, as described in the DOJ Investigation report:

a.     In May 2016**,** an inmate assailant strangled an inmate to death in his cell. When correctional officers found the victim lying face down in his bed, the victim's face was flattened indicating that he had been dead for quite some time. The assailant appeared to have urinated on the victim and carved the numbers '1636' into the decedent's ribcage post-mortem. Less than two weeks before the victim's death, he had been assaulted over a debt. Following that assault, prison personnel placed the victim in segregation for his protection, but they released him from segregation hours before his murder.

b.     In March 2017, two inmates attacked another inmate from behind while he was on the way to the dining hall. When an officer yelled for them to stop, one of the assailants ran from the officer, while the other continued stabbing the victim. The victim was transported to an

outside emergency room for treatment of stab wounds to the back, a perforated lung, and a stab wound to the head.

   c. In September 2017, two inmate assailants woke another inmate from his sleep by beating him with a sock filled with metal locks. The victim was transported to an outside hospital for emergency treatment because of the severity of his injuries.

   d. In September 2017, a lieutenant was conducting rounds in two open dormitories when he observed two inmates fighting with box cutters and homemade knives. The lieutenant radioed for assistance and waited for other officers to arrive. While two of the officers escorted one of the inmates to the health care unit, a third inmate stabbed the escorted inmate in the back. Officers sprayed the third attacker with pepper spray while a fourth inmate tried to stab the third attacker with a knife; the fourth inmate also was sprayed with pepper spray. One of the inmates was taken by ambulance to an outside emergency room for treatment of his injuries.

e.      In October 2017, the St. Clair Prison officers noticed an inmate leave his unit and enter the prison yard wearing only a blanket and socks. The inmate had been assaulted and severely beaten, appearing to have been bound with tape around his hands, ankles, mouth, and head, and the victim had a fresh burn mark on his face.

75.      Defendants had knowledge of the foregoing thirty-two violent incidents detailed in paragraphs 67 and 69.

76.      Each of the Defendants, including Defendant Administrative Supervisors and the Defendant Prison Supervisors, knew about each of the murders at the St. Clair Prison. Murders at the St. Clair Prison receive consistent media coverage, which include responses from ADOC spokespersons.

77.      Defendants also knew of the ongoing security crisis at the St. Clair Prison as the result of (a) reviewing incident reports, I&I reports, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, and inmate progress reports; (b) direct

observation of incidents; (c) communications among staff; and (d) inmate

lawsuits.

**D.    Defendants systematically have failed to address the epidemic of violence at the St. Clair Prison.**

78.    Despite having notice of the substantial risk of violence facing

inmates at the St. Clair Prison, Defendants deliberately failed to take

reasonable steps to address and reduce the risk of violence.

79.    In October 2014, EJI filed a class action lawsuit on behalf of

inmates at the St. Clair Prison, seeking injunctive relief to reduce the

ongoing violence at the St. Clair Prison. *See Duke* Litigation.

80.    Defendants Carter and Malone were named as defendants in

the *Duke* Litigation and served with the lawsuit. After Defendant Dunn

became the Commissioner in January 2015 and Defendant Estes became

Warden in March 2015, they both became defendants in the *Duke*

Litigation.

81.    The *Duke* Complaint, as amended, described the policies and

practices fueling the outbreak of violence at the St. Clair Prison, including

the failure of Defendant Administrative Supervisors and Defendant Prison

Supervisors to address the widespread proliferation of contraband

weapons at the prison. The lawsuit also focused on the creation of a

dangerous culture of violence and abuse, the failure to appropriately

respond to violence and rape, and inadequate staffing, supervision, and

monitoring of the prison.

82.     Despite the *Duke* Litigation, Defendant Administrative

Supervisors and Defendant Prison Supervisors still failed to take

reasonable, necessary, and appropriate steps to remedy the dangerous

conditions at the St. Clair Prison, with the result that violence at the St.

Clair Prison continued to escalate.

83.     After Defendant Dunn became the Commissioner, he failed to

take corrective actions to reduce the substantial risk of harm facing

inmates at the St. Clair Prison. He also failed to instruct Defendant Estes to

improve safety following his appointment as Warden of the St. Clair

Prison.

84.     As the new Warden of the St. Clair Prison, Defendant Estes

immediately became well aware of the violence and security challenges at

the St. Clair Prison, through his access to institutional reports, media

reports, and his observations of the St. Clair Prison.

85.     But as with Defendant Administrative Supervisors and other

Defendant Prison Supervisors, Defendant Estes failed to take corrective

action to improve safety at the St. Clair Prison.

86.     The epidemic of violence at the St. Clair Prison continues

today, with nearly all of the inadequate policies and procedures still in

place.

87.     Throughout 2017, EJI and the ADOC litigated and negotiated a

settlement in the *Duke* Litigation, which included many of the same issues

that led to Mr. Wood's attack.  Just months after Mr. Wood was attacked

and killed in July 2017, EJI and the ADOC reached a settlement in

November 2017, in which the ADOC promised to make substantial

reforms. But Defendant Administrative Supervisors and Defendant Prison

Supervisors failed to implement the reforms and satisfy several of the

settlement requirements. As a result, in June 2018, only eight months after

reaching the settlement, the parties returned to mediation.

88.     In April 2019, the DOJ issued a report containing its findings from its two-year investigation of Alabama's prison facilities that began in October 2016. The report detailed systemic operational and policy issues causing the epidemic of violence at the St. Clair Prison.

89.     The DOJ Investigation report explains how Defendants previously knew about the violence, contraband, corruption, and harm at the St. Clair Prison well before the DOJ initiated the investigation in October 2016. The report identified at least three publicly reported inmate-on-inmate homicides in 2014 alone.

90.     In addition to knowing about the extensive violence and proliferation of contraband at the St. Clair Prison, the DOJ Investigation report described the acute awareness of Defendant Dunn and ADOC of the substantial risk of harm caused by the dangerous level of understaffing. Incident reports from 2017 revealed numerous instances where tired and overworked correctional officers were not showing up for work or were refusing to work mandated overtime.

91.     The DOJ Investigation report also found incident reports of correctional officers sleeping in the "cube" while on duty or sleeping in the hospital or perimeter security vehicles.

92.     Despite the *Duke* Litigation and the two-year DOJ Investigation, the violence at the St. Clair Prison – and Defendants' failure to implement and abide by adequate security precautions – continues unabated.

**E.     Numerous inmates at the St. Clair Prison have been victimized by extortion schemes.**

93.     Reflecting the same inadequate security that leads to the epidemic of violence at the St. Clair Prison, numerous inmates at the prison use illegal drugs, including methamphetamine, methadone, heroin, suboxone, and marijuana. Drug abuse and addiction among inmates is widespread and was widespread at the time Mr. Wood was extorted, threatened with violence, and murdered in his cell.

94.     Because of Defendant Administrative Supervisors and Defendant Prison Supervisors' failure to implement proper security protocols and monitoring of prison personnel, staff willfully violate ADOC

policy and smuggle contraband into the St. Clair Prison. This has enabled widespread corruption among officers, and officers are able to extort money and favors from inmates in exchange for drugs.

95.     At least one correctional officer at the St. Clair Prison was arrested for smuggling contraband and facilitating extortion schemes during the time Mr. Wood was at the St. Clair Prison. In June 2019, Willie Gene McLemore, a former St. Clair Prison Correctional Officer, was arrested after a two-year investigation uncovered he was using his official position for financial gain. McLemore is accused of taking money from inmates to smuggle illegal contraband into the St. Clair Prison. A forensic audit of McLemore's finances from 2017 to 2019 uncovered he received money from electronic transfers that were traced back to an inmate's criminal activity in the St. Clair Prison.

96.     Inmate-on-inmate extortion schemes were pervasive at the time Mr. Wood was at the St. Clair Prison. Inmates would target vulnerable inmates who had family members known to provide financial support.  Inmates extorted other inmates by forcing them to call their

families on contraband cell phones to request substantial sums of money

or face physical violence.

97.     Drugs create a substantial risk of serious harm and are a major

source of conflict and extortion at the St. Clair Prison, both because of

behavior stemming from addiction (for which Defendant Administrative

Supervisors and Defendant Prison Supervisors have failed to provide

adequate services and treatment) and because of the dynamics of debt

created by officers' and inmates' participation in drug sales.

98.     In 2015, approximately twenty inmates came forward

separately and requested protective custody because they were at risk of

physical violence as a result of debt and extortion. In nearly every such

incident, the individual was put into an isolation cell in segregation and

was given a disciplinary infraction.

99.     The behavior of certain officers in response to protective

custody requests related to debt and extortion was particularly egregious.

One officer responded to an inmate's request for protective custody over a

contraband-related debt by attempting to orchestrate a payment plan between the inmate and the men extorting him.

100.   Defendants were put on notice of the prevalent extortion at the St. Clair Prison through their participation in the unlawful schemes, their roles at the St. Clair Prison and at ADOC, internal ADOC reports, communications with staff and inmates, and the *Duke* Litigation.

101.   Nonetheless, with deliberate indifference to a substantial risk of harm to inmates such as Mr. Wood, Defendants failed to address the widespread and deadly extortion schemes at the St. Clair Prison.

**F.    Defendants encouraged, rather than acting to prevent, the proliferation of contraband weapons at the St. Clair Prison.**

102.   Defendants were aware of the widespread proliferation of contraband weapons at the St. Clair Prison at the time of Mr. Wood's murder, and exhibited deliberate indifference to the substantial risk of harm that such weapons created to inmates such as Mr. Wood.

103.   At the time of Mr. Wood's assault and murder, it was common knowledge among staff at the St. Clair Prison that the inmate population

- 44 -

was heavily armed, and some prison personnel actually encouraged

inmates to obtain and use weapons.

104.   On a regular basis, health care professionals in the St. Clair

Prison's infirmary saw stab wounds, such as the lacerations in Mr. Wood's

chest and shoulder.

105.   In the words of former correctional officer Jonathan Truitt in a

January 2017 article, a single 24-person cell block at the St. Clair Prison

could contain "30 to 40" contraband knives; contraband was "out of

control"; and inmates were "being assaulted in every way imaginable."

106.   Between 2015 and 2017, prison personnel found ammunition

and firearms at least three times at the St. Clair Prison.

107.   Prison-made weapons are common throughout the St. Clair

Prison. One former correctional officer, David Ellis, recalls seeing knives

made out of vent slats, ice picks sharpened from copper plumbing rods,

and homemade zip guns fashioned with a wooden block, a nail, rubber

bands, and a bullet.

108.   Mr. Ellis also recalled an encounter with an inmate carrying a sword inside of the St. Clair Prison in 2017. Mr. Ellis stepped into the G-Gate "guard shack," and two minutes later an inmate was standing outside pointing a sword toward Mr. Ellis's chest.

109.   Knives were commonly used in assaults at the St. Clair Prison, including in the stabbing death of Timothy Bradford Latham and in the assaults of Victor Russo, Derrick LaKeith Brown, Elliott Blount, Micah Mays, J.M., Brandon Ladd, Larry Hill, Dillon Cole, David Beech, Nakia Echols, Jamal Woods, James Dorriety, W.C., Michael Townsel, Michael McGregor, Janarious Smith, Omar and Jamal Denson, Douglas Simon, and Jaime Chavez.

110.   In the *Duke* Litigation, EJI highlighted the widespread availability of weapons and contraband at the St. Clair Prison, providing several detailed examples of stabbings and other violent incidents that had occurred while Defendant Estes was Warden.

111.   Defendant Administrative Supervisors and Defendant Prison Supervisors did nothing to curtail the widespread availability of

contraband weapons at the St. Clair Prison, exhibiting deliberate indifference to inmates such as Mr. Wood who were likely to be victimized by such weapons.

112.   Instead, Defendant Administrative Supervisors and Defendant Prison Supervisors fostered and enabled the accumulation of weapons through at least three procedures and practices: (a) the encouragement of violence; (b) inadequate search procedures; and (c) inappropriate responses when weapons were recovered.

113.   As Defendant Administrative Supervisors and Defendant Prison Supervisors were well aware, their deficient search procedures also promoted and enabled the accumulation of contraband weapons at the St. Clair Prison.

114.   Security staff at the St. Clair Prison did not regularly conduct prison-wide searches and other standard prison search protocols and procedures to root out contraband.

115.   Defendant Prison Supervisors turned a blind eye to noncompliance with search protocols at the St. Clair Prison.

116.    Defendant Estes further chose to not conduct any internal security audits of the St. Clair Prison's compliance with search protocols and the level of safety in the institution.

117.    When Defendant Prison Supervisors recovered weapons from inmates, they responded with indifference, often declining to discipline inmates found with knives.

118.    The failure to discipline the possession of weapons created a dangerous culture whereby inmates knew they could possess weapons with impunity and felt emboldened to use those weapons without fear of incurring any disciplinary citations.

119.    For example, a captain at the St. Clair Prison recovered a knife from J.M's assailant, J.D., in February 2015, but J.D. was not disciplined for the incident. In September 2015, a lieutenant at the St. Clair Prison recovered another knife from J.D., but Defendants failed to impose any discipline on J.D.

120.    Even in the aftermath of the *Duke* Litigation, Defendant Administrative Supervisors and Defendant Prison Supervisors made no

meaningful attempt to address contraband weapons at the St. Clair Prison, exhibiting deliberate indifference to the resulting substantial risk of harm created for inmates such as Mr. Wood who would fall victim to those weapons.

## G. Defendants have created a culture of abuse and violence at the St. Clair Prison.

121. Defendants fueled a culture of violence at the St. Clair Prison by engaging in violence themselves, tolerating and condoning violence by staff members, and failing to discipline inmates for violent acts.

122. For example, Defendant Malone has a history of victimizing inmates:

a. On or about December 3, 2014, Defendant Malone assaulted inmate Marcus Webb while he was handcuffed in the infirmary. Mr. Webb suffered head and arm injuries.

b. In 2014, Defendant Malone punched a handcuffed inmate in the head, chipping the inmate's tooth.

c. In April 2015, officers, including Defendant Malone, assaulted Unteyus Stephens when he attempted to comply with orders to

return to his cell. The officers struck Mr. Stephens with a television stand and struck him in the chin and ribs with batons. After officers handcuffed him and took him out of the cell block, Defendant Malone slammed him into a wall. Mr. Stephens required numerous stitches as a result of his injuries.

d.    In May 2015, Defendant Malone and Officer Jones assaulted Terrance Seay during a cell extraction by hitting him with a shield and standing on top of him. After Mr. Seay was in the infirmary, Officer Jones and Defendant Malone punched Mr. Seay while he was still handcuffed.

e.    Upon information and belief, in September 2015, Defendant Malone and Officer McMillan placed Jesse Roberts in handcuffs and leg shackles, then assaulted him by striking him with a flashlight and baton in the face and head. Defendant Carter watched the attack of Mr. Roberts but did not intervene.

123.   Defendant Administrative Supervisors and Defendant Prison Supervisors, including Defendant Estes and Defendant Carter, refused to

discipline correctional officers for using excessive force against inmates,

even when those officers, such as Defendant Malone, had a history of

abusive behavior. For example:

a.    On January 3, 2015, officers beat Shakil Gamble and

ordered him to the shift office where he was directed to stand facing the

wall. While Mr. Gamble was standing with his hands against the wall,

Officer Tolliver repeatedly slammed his head into the wall. Additional

officers entered the shift office, including Defendant Carter. Officers began

to beat Mr. Gamble and strike him with their batons. Mr. Gamble's head

was also slammed against the floor.

b.    Upon information and belief, in January 2015, officers in

the L-Block body-slammed Zendarius White after he asked why the

officers were harassing other inmates.

c.    In January 2015, multiple officers assaulted Justin

Jackson by punching him, slamming him to the ground, kicking him, and

striking him with their batons, all while he was handcuffed. The officers

dragged Mr. Jackson to the infirmary and continued assaulting him until

they locked Mr. Jackson in a temporary holding cage. While in the cage, Officer Howard began to beat Mr. Jackson again, all while Mr. Jackson remained handcuffed.

        d.    On or about February 3, 2015, two officers assaulted Demetric Pritchett while he was handcuffed. Mr. Pritchett requested to see a supervisor regarding threats he was receiving from other inmates in the segregation cell block. Officers Schmid and Patton escorted him outside his cell and into a hallway, where they repeatedly punched him in the face.

        e.    In April 2015, multiple officers assaulted Gerald Vann when he attempted to comply with orders to return to his cell. The officers beat Mr. Vann with batons, then picked him up and rammed him head-first into a brick wall. Mr. Vann required treatment at an outside hospital, including receiving dozens of staples to close the large gashes on his head.

        f.    In April 2015, multiple officers beat Darius Mines with batons as he tried to comply with orders to return to his cell. The officers continued to assault Mr. Mines after he was handcuffed, and he received multiple staples to his head as a result of these injuries.

g.     In April 2015, officers struck Bernard Abney in the head with a baton while he was attempting to return to his cell in P-Block. The officers threw him to the ground and struck him multiple times. As a result of the assault, Mr. Abney suffered a broken bone in his back and required hospitalization following the assault.

h.     In April 2015, officers assaulted Maurice Green when he was attempting to return to his cell. The officers threw him to the ground and kicked him, resulting in several of his teeth being chipped.

i.     In April 2015, Officers Tolliver and Burns assaulted Xabrian Austin following a strip search in his cell. The officers sprayed Mr. Austin with a chemical spray, handcuffed him, and took him to the shift office. The officers proceeded to punch Mr. Austin while he was handcuffed inside the shift office. The assault occurred in the presence of Defendant Carter.

j.     In April 2015, officers assaulted Gerald Ingram by striking him in the rib cage with a baton.

k.    In May 2015, Officer Fife and Officer Burns assaulted Brandon Ladd during a cell extraction. Officer Burns kicked Mr. Ladd while he was laying on his stomach in handcuffs and shackles, and Officer Fife hit Mr. Ladd repeatedly in the head with handcuffs wrapped around his fist.

l.    In July 2015, Sergeant Hamilton and Officer McQueen assaulted Dillon Cole in the C-2 block of segregation. The officers handcuffed him behind his back, threw him to the ground, and kicked him. After not providing Mr. Cole with medical treatment, the officers held him in a temporary holding cage outside the segregation unit for approximately eight hours.

124.   Defendant Prison Supervisors knew of the incidents identified above through internal reports, including use of force reports, incident reports, duty officer reports, and medical reports, as well as through external sources such as the *Duke* Litigation and other inmate lawsuits.

125.   On information and belief, none of the officers received meaningful discipline for the abuses detailed above..

126.   The failure of Defendant Administrative Supervisors and Defendant Estes to discipline officers for excessive force and other misconduct signaled to the correctional officers at the St. Clair Prison that they could abuse, or fail to protect, inmates without fear of any adverse consequences.

127.   The failure to discipline officers for excessive force and other misconduct also signaled to inmates at the St. Clair Prison that they could abuse other inmates without fear of any adverse consequences.

128.   Defendants also failed to properly investigate and discipline acts of violence by inmates, emboldening violent inmates, such as Mr. Wood's assailants, by permitting them to extort and assault other inmates with impunity.

129.   Defendants' conduct created a dangerous culture of violence at the St. Clair Prison, which heightened the risk of inmate assaults on vulnerable inmates such as Mr. Wood.

130.   Defendants were put on notice of the culture of abuse and violence at the St. Clair Prison through their participation in it, their roles

at the prison and ADOC, internal ADOC reports, communications with

staff and inmates, inmate lawsuits, and media coverage.

131.   Despite knowledge of the violence at the St. Clair Prison,

Defendants acted with deliberate indifference to a substantial risk of harm

to inmates such as Mr. Wood by failing to address their own culture of

violence.

## H.   Defendants failed to supervise and monitor Mr. Wood's housing unit.

132.   Defendant Prison Supervisors placed Mr. Wood in a general

population housing with inmates known for extorting vulnerable inmates

such as Mr. Wood.

133.   Having placed Mr. Wood in general population, Defendant

Prison Supervisors failed to promulgate, implement, and enforce adequate

policies, procedures, and practices necessary to properly supervise and

monitor Mr. Wood's housing unit.

134.   Most of the housing units in general population house

approximately 96 inmates, with a single correctional officer assigned to

supervise the entire block. The correctional officer is stationed in a "cube,"

which has windows that give the officer limited sight lines into both sides of the block.

135.   Occasionally, an officer is assigned as a "rover" to patrol the housing blocks. Because of a dangerous level of understaffing at the St. Clair Prison, rover officers were often pulled away from patrolling to escort inmates and to serve in various other capacities.

136.   The correctional officers stationed in the "cube" were typically the only officer monitoring Mr. Wood's housing unit. These officers were at times absent, asleep, or otherwise not paying attention to the inmates they were monitoring.

137.   As documented in the DOJ Investigation report, and known by all Defendants, the St. Clair Prison was dangerously understaffed at the time of Mr. Wood's murder.

138.   The limited number of correctional officers employed at the St. Clair Prison were overworked. In 2017, a correctional officer with a base pay of $38,426.60 earned almost $80,000.00 in overtime because of officer

shortages. The average work week for correctional officers approximated 90-95 hours per week.

139.   The St. Clair Prison's chronic understaffing and overworked staff interfered with critical security functions, including the monitoring of inmates and the conducting of regular prison-wide searches for contraband.

140.   Defendant Administrative Supervisors and Defendant Prison Supervisors are well aware of the understaffing. Before Mr. Wood's murder, Defendant Dunn acknowledged that at the St. Clair Prison and other prisons, "the fundamental, systemic problem is a combination of lack of staff and overcrowding."

141.   Defendants were likewise aware that their failure to adequately supervise inmates created a dangerous environment conducive for inmates to assault and murder other inmates, such as the violent murder of Mr. Wood.

142.   Defendants knew of at least four security deficiencies that, when coupled with understaffing, created a substantial risk of harm to

inmates: (a) faulty locking mechanisms on the majority of cell doors;

(b) "blind spots" in the housing areas due to limited sight lines; (c) the lack

of surveillance cameras and mirrors; and (d) the lack of emergency call

buttons in the cells to summon assistance from staff.

143.   Defendants knew the combination of these security

deficiencies gravely contributed to numerous violent incidents in the years

leading up to Mr. Wood's murder.

144.   Defendants further knew about the St. Clair Prison's security

deficiencies based on the *Duke* Litigation, which addressed in detail the

broken locks, the understaffing, the blind spots, and the inadequate

supervision of staff at the St. Clair Prison.

145.   Even though Defendants knew that their existing policies and

practices were deficient and created a substantial risk of harm to inmates,

they failed to take any meaningful corrective action.

146.   Instead, Defendants chose to leave inmates exposed to a

continuing risk of serious harm, exhibiting deliberate indifference to their

safety.

## COUNT I
## 42 U.S.C. § 1983 CLAIM
## VIOLATION OF THE EIGHTH AMENDMENT

147.   Plaintiff adopts each and every allegation contained in paragraphs 1-156 as if set forth fully herein.

148.   Plaintiff, as the personal representative of the estate of Decedent Joseph Wood, brings this claim against Defendants for depriving Mr. Wood of the right to be free from known and unreasonable risk of serious harm while in ADOC custody, in violation of the Eighth Amendment.

149.   Defendants, while acting under the color of state law, recklessly, willfully, or intentionally deprived Mr. Wood of his rights under the Eighth Amendment to the United States Constitution. Defendants failed to take reasonable measures to protect Mr. Wood from violence at the hands of other St. Clair Prison inmates.

150.   Defendants knew of and consciously disregarded the substantial risk that Mr. Wood would be injured while in custody at the St. Clair Prison, and failed to protect him from harm.

- 60 -

151.   In engaging in this unlawful conduct, Defendants were not acting within their discretionary authority, and their conduct violated clearly established rights, including Mr. Wood's constitutional right to be protected from physical assault by other inmates.

152.   Defendants showed deliberate indifference, malice, willfulness, or recklessness to Mr. Wood's rights, safety, and well-being. Defendants' conduct was objectively unreasonable.

153.   Because of the frequency with which Mr. Wood faced threats, intimidation, or bullying, Defendants subjectively knew that Mr. Wood faced a substantial risk of serious harm.

154.   Defendants disregarded this known risk by failing to respond in an objectively reasonable manner, including but not limited to failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to isolate dangerous inmates; failing to regularly and consistently monitor and secure Mr. Wood's cell; failing to adhere to Mr. Wood's warnings and concerns about his own safety regarding extortion and violent threats by other inmates; failing to

properly staff the St. Clair Prison with prudent and well-trained correctional officers; and failing to address known security deficiencies, such as lack of intercoms, security cameras, and mirrors.

155.   There was a causal connection between Defendants' conduct and the violation of Mr. Wood's Eighth Amendment rights.

156.   As a proximate result of Defendants' deliberate indifference, Mr. Wood was brutally beaten and strangled to death by an unknown assailant or assailants while in his cell.

157.   Plaintiff seeks compensatory and punitive damages due to Defendants' reckless, wanton, willful, or intentional conduct, in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT II
## WRONGFUL DEATH

158.   Plaintiff adopts each and every allegation contained in paragraphs 1-156 as if set forth fully herein.

159.   Plaintiff brings this action under Alabama Code § 6-5-410.

160. Defendants, by the acts or omissions specified herein, unlawfully allowed an unknown assailant or assailants to unlawfully cause the death of Mr. Wood while incarcerated at the St. Clair Prison.

161. Defendants' acts and omissions were not in line with the scope of their duties, nor were they in compliance with federal law or state law, rules, policies, or regulations. Defendants had a duty to protect Mr. Wood from known and unreasonable risk of serious harm, including homicide by another inmate.

162. Defendants disregarded the known risk of harm to Mr. Wood by failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to isolate dangerous inmates; failing to regularly and consistently monitor and secure Mr. Wood's cell; failing to adhere to Mr. Wood's warnings and concerns about his safety due to extortion and violent threats by other inmates; failing to properly staff the St. Clair Prison with prudent and well-trained correctional officers; and failing to address known security deficiencies, such as lack of intercoms, security cameras, and mirrors.

163.   Because of the relationship between the Defendants and Mr. Wood, as well as the foreseeability of the harm that ultimately befell Mr. Wood, Defendants are liable for the criminal acts of the third-party assailant or assailants.

164.   As a proximate result of Defendants' wrongful conduct, Mr. Wood was brutally beaten and strangled by an unknown assailants while in his cell.

165.   Plaintiff seeks compensatory and punitive damages in an amount to be determined by the jury, together with interest and the costs of this action.

WHEREFORE, Plaintiff Angela Wood respectfully requests that the Court:

(a)    award compensatory damages against Defendants, jointly and severally, in an amount to be determined;

(b)    award punitive damages against Defendants, jointly and severally;

(c)     award reasonable attorneys' fees and expenses of litigation;

and

(d)     award any other relief the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully submitted this 23rd day of June, 2021.

*s/Laura S. Gibson*
Laura S. Gibson
Alabama Bar No. 8271-O74L
lgibson@whitearnolddowd.com
WHITE ARNOLD & DOWD P.C.
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Telephone: (205) 323-1888
Facsimile: (205) 323-8907

John P. Jett (*pro hace vice*)
Brittany Nash Herbert (*pro hac vice*)
KILPATRICK TOWNSEND &
STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone (404) 815-6500
Facsimile  (404) 815-6555
jjett@kilpatricktownsend.com

- 65 -

bherbert@kilpatricktownsend.com

Timothy E. Taylor  (*pro hac vice*)
W. Alan Wright (*pro hac vice*)
KILPATRICK TOWNSEND &
STOCKTON LLP
2001 Ross Avenue, Suite 440
Dallas, TX, 75201
Telephone (214) 922-7100
Facsimile (214) 922-7101
ttaylor@kilpatricktownsend.com
alan.wright@kilpatricktownsend.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This certifies that I have this day served a true and correct copy of the within and foregoing PLAINTIFF'S THIRD AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following counsel of record:

Charles Richard Hill , Jr.
Robert Flowers Northcutt
Capell & Howard, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL 36102-2069
crh@chlaw.com
bob.northcutt@chlaw.com

This 23rd day of June, 2021.

_s/Laura S. Gibson_
Laura S. Gibson
Alabama Bar No. 8271-O74L